Jo Ann Kingston
4200 Park Boulevard, #271
Oakland, CA 94602
kingstonlaw@comcast.net
510-530-7800 phone
California bar number 71496

Robert Bloom
1514 10th Street
Berkeley, CA 94710
bbloom222@hotmail.com
510-900-1515

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

_____

**Bennett Montoya, Karen King,**
**BMGV-LLC,**

                Plaintiffs

        -v-

**City of San Francisco, CA,**
**SFPD Commander David Lazar,**
**SFPD Officer Steve Matthias**
**and John and Jane Does,**

                Defendants

**Case number**

_____

**COMPLAINT**

**42 U.S.C.§ 1983** *et*
*seq,* **§ 1988**

Jury Trial
Demanded

1

## **INTRODUCTION**

1. This case is about racism and racist conduct by the San Francisco Police Department.

2. Particular police officers in the San Francisco Police Department (SFPD) engaged in blatantly racist efforts to shut down Atmosphere, a nightclub on the busy entertainment 400 block of Broadway (the club has changed it name to Hue), because the club features hip-hop music that attracts African-American patrons.

3. In the words of SFPD Captain David Lazar (he has recently been promoted to Commander), who is the driving force behind the racist conduct, hip-hop music that was and is featured by the club "brings in the wrong crowd", "a crowd we do not want". His target was and is African-Americans. His words and his conduct demonstrate that he set out to shut down the club in order to keep African-Americans from coming to the Broadway nightclub area.

4. At the direction of Captain Lazar, several SFPD officers under his command participated in the effort to keep Black people, "the wrong crowd", from coming to Broadway. Among other acts, the SFPD provided false and misleading reports to the California Alcoholic Beverage Control Board (ABC) and the San Francisco Entertainment Commission (EC). These reports provided the basis for the EC's decision to amend the club's permit to bar it as of June 6, 2017, from presenting live entertainment, including and especially popular hip-hop disc jockeys, after midnight. In the nightclub business, such a restriction is a death-blow to a club's survival.

5. The SFPD also provided false and misleading

2

reports to the ABC, which resulted in an Accusation by the ABC that the club was a "disorderly house" and a law enforcement problem.

6. Captain Lazar more than once expressed his racist "wrong crowd" comments directly to Bennett Montoya, plaintiff, co-owner and operator of the club, and he did so on at least one occasion in the presence of another person. On one particular occasion, Lazar made his "wrong crowd" statements in the presence of Benjamin Horne, who was at that time the director of the Top of Broadway Community Benefit District (BCBD), a non-profit organization that plays an active role in monitoring activities in the Broadway entertainment area.

7. Mr. Horne provided testimony regarding Captain Lazar's comments when he was called as a witness at a hearing before an administrative law judge in 2015 regarding this matter. Mr. Horne was called as a witness adverse to plaintiffs at the hearing *by the ABC*. He nevertheless testified truthfully about statements made by Captain Lazar, corroborating Plaintiff Montoya's testimony before the administrative law judge who was conducting the evidentiary hearing regarding the ABC's inquiry into whether the club was a "disorderly house".

8. Captain Lazar also "recommended" to Mr. Montoya a number of times to cease presenting hip-hop music at the club (the club was known at that time, 2014, as Atmosphere). There can be no question that the "recommendation" of a police captain was, in fact, an ultimatum and a threat.

9. In furtherance of his efforts to shut down the club and thus keep African-Americans ("the wrong crowd")

from coming to Broadway, Captain Lazar directed SFPD officers under his command to prepare reports to the ABC that would lead the ABC to attempt to revoke the club's license by finding that the club was a "disorderly house". Captain Lazar also directed SFPD officers to provide false and misleading reports to the EC to cause the EC to revoke and/or impose limitations on the club's permit and shut down the club.

10. The SFPD officer who drafted and provided most of the reports to the ABC and to the EC was Officer Steve Matthias. Nearly all the SFPD reports prepared by Officer Matthias regarding the club were deceitful and/or misleading. Those reports falsely attributed to the club nearly all misconduct and criminal activity that took place anywhere in the 400 block of Broadway, nearly all of which activity was unconnected to the club.

11. That fraudulent tactic was accomplished in part via Captain Lazar's direction that the SFPD park a marked and manned SFPD patrol car in front of or directly across the street from the club. That stratagem by Captain Lazar was (and still is) intended to accomplish two goals:

(1) producing SFPD reports that falsely identified the club as the problem. That fraud was accomplished by SFPD officers listing the club as the source of incidents and disturbances that happened elsewhere in the 400 block of Broadway based solely on the location of the police vehicle that was parked at or very near the club. The reports that were prepared by Officer Matthias and other officers attributed negative events to the club based solely on the geographic location of the police car, despite the fact that nearly all of the events had taken

4

place at or near other locations on Broadway and were unrelated to the club. The reports were provided by the SFPD to the ABC and to the EC, both of which took action against the club based primarily on the false and misleading SFPD reports.

12. The other reason Captain Lazar directed that SFPD officers park a manned marked police car in front of or directly across the street from the club was to intimidate African-Americans, most of whom were and are acutely aware of the risks they face because of extremely racist attitudes and conduct by SFPD officers against African-Americans[1].

13. This deplorable conduct was conceived and directed by Captain Lazar. It was and is an integral part of the effort to shut down the club and thus keep the "the wrong crowd, a crowd we don't want" off Broadway. The false and misleading SFPD reports were submitted to

---

[1]. In October of 2016, The United States Department of Justice published a lengthy and detailed Report regarding racism and racist conduct by the SFPD. The Report is scathing in its criticism of the SFPD's racist attitudes and conduct. The racist practices by the SFPD that are described in the Report are well-known, particularly in the Black Community.

There was considerable publicity regarding recent revelations involving a number of SFPD officers who sent appallingly racist "humorous" text messages to each other. Despite the fact that these highly publicized events were whitewashed by the SFPD and the City of San Francisco, the disclosure of this conduct increased awareness by the public of racism by the SFPD, especially so in the Black community. These issues are described in the Department of Justice Report, as are data regarding racially-motivated traffic stops and other SFPD conduct targeting African-Americans. The racism of many SFPD officers is notorious, and parking a marked and manned patrol car in front of Atmosphere (Hue) was and is intended to intimidate African-Americans and keep them from coming to Broadway to patronize the club. The stationing of a SFPD patrol vehicle in front of or very near the club at the direction of Captain Lazar was clearly intended to intimidate and discourage African-American patrons from coming to Broadway.

the ABC Board and to the EC by the SFPD. Based largely on these reports, the EC ruled on June 6, 2017 that the club could not present live entertainment after midnight. This limitation has, predictably, decimated the club's business and has caused disastrous financial and other damage to plaintiffs.

14. Further, the false and misleading police reports led to a formal Accusation against the club by the ABC that has jeopardized the club's license. The issues that have been created by the Accusation have been the subject of protracted litigation. This litigation has been very costly for plaintiffs, financially and otherwise. The litigation continues, and the club's license is at risk because of Lazar's racist crusade and the *de facto* sanctioning and endorsement of those efforts by two SFPD Chiefs of Police and other leadership of the SFPD.

15. Captain Lazar also engaged in, and directed, other efforts to shut down the club. He convened meetings that required Mr. Montoya and his business partner (and wife), Karen King, to justify conduct that was improperly attributed to the club.

16. Captain Lazar also created pretextual physical intrusions into the club, including at least one "raid" on the club that led to allegations of labor violations. In fact, under Captain Lazar's direction, the police invaded Atmosphere <u>nine times</u> in two months, December 13, 2014, through February 15, 2015. The SFPD also invaded the club three times after it changed its name to Hue. These and other acts that were directed and ordered by Captain Lazar, with the participation of other SFPD officers, were implemented for the purpose of shutting

down the club. <u>No other club in San Francisco has been subjected to anything approaching these kinds of actions</u>. There was, and is, selective targeting of this club because it features hip-hop entertainment that attracts Black patrons.

17. Captain Lazar and other officers also engaged in other activities to target and harass the club and people associated with it. For example, an employee of the club, Samantha Bigueur, left the club after work late one night to learn that her car had apparently been hit by a driver who had left the scene. Ms. Bigueur went to the officers who were seated in the patrol car that was parked across the street from the club to ask the officers to file a report about the incident. Instead of doing so, they told her that she would have to go to the police station to file a report. When she protested at having to make her way unescorted to the police station several blocks away at 2 AM, the officers laughed in her face and told her, "We know where you work".

18. There can be no question that the SFPD chose to target this club and everyone associated with it. In fact, the ABC found in 2016 after an evidentiary hearing that plaintiffs had a *very strong case* that *[the club] and its management are the targets of selective enforcement* (emphasis added). (The ABC did not rule on the issue at that time because it chose to make its determination of contested issues on narrower grounds). The issue of selective enforcement is currently the subject of inquiry by the ABC Appeals Board which has been directed by the California Court of Appeals to make a finding regarding that issue.

19. As a result of Captain Lazar's intentional racially-motivated efforts to target and shut down the club, and thus keep African-Americans from participating in the Broadway entertainment scene, the EC decided on June 6, 2017, as noted above, to modify the club's permit to bar the club from presenting live entertainment (including popular disc jockeys) after 12 midnight. This decision by the EC was largely based on the false and misleading reports that were provided to the EC by SFPD officers.

20. The midnight limitation has been devastating to the club and to the plaintiffs. It has decimated the income and destroyed the viability of the club and caused a range of very significant pecuniary and other damages to the club and to plaintiffs. Yet again, African-Americans are the targets of racism by the SFPD and the City of San Francisco. As a result, the plaintiffs have suffered, and continue to suffer, significant damages.

21. The damages include:

*loss of business income every night the club is open, Thursday through Sunday. That loss of income continues to this day;

*loss of private rentals of the club (especially in the holiday season when corporate entities rent clubs such as Hue for holiday events). A number of corporate rentals of the club have been lost in 2017 since the EC barred the club from presenting live entertainment after midnight;

*substantial attorney fees, including fees for ABC counsel, labor attorneys, and present counsel;

*drastic reduction in the value of the business;

*damage to plaintiffs' personal and business reputation;

8

negative impact on plaintiffs' credit standing;
draining of plaintiffs' financial and personal
resources;

extreme disruption of and damage to plaintiffs' personal
lives as a result of having to focus on the problems
created by the racist conduct of the SFPD, including
limitation of available time for plaintiffs to devote to
their young daughter, as well as the immense stresses
that now plague their lives, including emotional pain and
suffering.

22. The negative effects of the conduct by Captain
Lazar and other SFPD personnel, including acquiescence in
and *de facto* sanctioning of this racially-motivated
misconduct by two SFPD Chiefs of Police and other
supervisory SFPD officials, are ongoing. Damages increase
every day the midnight limitation imposed by the EC is in
effect.

23. Beyond the impact on plaintiffs and on the club
that is addressed in the instant Complaint, a further
tragedy is the fact that this blatant racism is taking
place in the truly magnificent and progressive city of
San Francisco.

## JURISDICTION

24. This Court has jurisdiction pursuant to the Civil
Rights Act, 42 U.S.C.1983 *et seq* and 1988, United States
Judicial Code 1331 and 1343.

## VENUE

25. Venue in the Northern District of California is

9

proper because Plaintiffs and Defendants reside therein, and the relevant events took place therein.

## PARTIES

**Plaintiffs**:

26. Bennett Montoya and Karen King, owners and operators of Hue, a nightclub.

BMGV-LLC, the corporate entity that owns Hue.

**Defendants**:

27. The City of San Francisco, California, a municipal corporation that operates and controls the San Francisco Police Department.

SFPD Commander (formerly Captain) David Lazar,

SFPD Officer Steve Matthias.

## STATEMENT OF FACTS

28. Plaintiffs Bennett Montoya and his wife and business partner, Karen King, own and operate a nightclub on the busy 400 block of Broadway in San Francisco, California. They opened the club in 2008. It was known at that time as Atmosphere. It is now known as Hue. The corporate entity is BMGV-LLC.  There are approximately ten other nightclubs on the block, and Hue is the largest one. Plaintiffs have managed the club very efficiently and professionally. The fact that the club has been operating for nine years is noteworthy because most nightclubs close after a few years. Mr. Montoya is regarded as an excellent and responsible manager.

10

29. All the SFPD officers who have interacted with Mr. Montoya other than Captain Lazar hold him in high regard. They describe him as "co-operative", "a very nice individual", "a gentleman", "very cordial", "responsible". They have testified at an evidentiary hearing to that effect and in those words. They have "never had a bad experience" with him. The officers have also stated that he and his security team have actively assisted SFPD officers in dealing with troublesome individuals on the street, and that Mr. Montoya has implemented measures to encourage and maintain peaceful behavior on the street, such as toning down music and adjusting lighting at closing time. He has done everything possible to minimize noise problems, including making costly renovations. He has o employed professional and responsible security personnel. His employees have undergone training to assist them in addressing problems that are related to managing intoxicated patrons. He has fully co-operated with all SFPD protocols regarding the management of unruly and intoxicated people in the area of the club.

30. As to the issue of party busses (which often bring intoxicated people to many of the clubs on Broadway and elsewhere) Mr. Montoya agreed long ago to decline the lucrative income that is generated by party busses.

31. From the outset in 2008, Mr. Montoya developed and maintained an excellent relationship with all four successive captains who headed SFPD's Central Station. But in May of 2014, Captain David Lazar took the helm at Central Station and everything changed for the worse. Until Captain Lazar took over the leadership of Central

station, the club had never had any major problems. It had never received any warnings or violations of any kind from the Alcohol Beverage Control Board (ABC) that supervises nightclubs, or from the SF Entertainment Commission (EC) that issues and supervises permits to nightclubs in San Francisco.

32. The objective and uncontradicted evidence demonstrates that Captain Lazar (who has been promoted to Commander) determined that he would destroy the club when he took over the leadership of the Central Station in May of 2014. His actions and his statements demonstrate that he decided that he was going to close the club, and that his decision to do so was motivated by his desire to eliminate or minimize the presence of African-Americans on Broadway.

33. The club frequently features hip-hop music that attracts an African-American clientele. As expressed in his own words, Captain Lazar stated that the club's hip-hop entertainment was "attracting the wrong crowd, a crowd we don't want". More than once, he "recommended" to Mr. Montoya that he stop presenting hip-hop entertainment (well-known disc jockeys who are very popular in the hip-hop community).

34. When, in the opinion of Captain Lazar, Mr. Montoya did not comply with his "recommendations" that he terminate hip-hop entertainment, Captain Lazar and SFPD officers under his command undertook measures to destroy the club and to put it out of business.

35. Lazar instituted and directed a number of actions to accomplish his goal of eliminating "the wrong crowd" from the Broadway entertainment scene. One of his tactics

was directing SFPD officers under his command to park a manned marked police car in front of, or directly across the street from, the club. The purpose of this tactic was twofold:

One of Captain Lazar's goals was to intimidate African-Americans by the mere presence of SFPD officers. It was, and is, well-known in the Black community that the SFPD is regarded as extremely racist against African-Americans. The factual basis of this understanding is embodied in a scathing Report issued by the United States Department of Justice in October of 2016.

36.That Report found, *inter alia*, the following, verbatim:

Re Use of force by the SFPD:
• The majority of deadly use of force incidents by the SFPD involved persons of color.
• The SFPD does not adequately investigate officer use of force.
• The SFPD does not maintain complete and consistent officer-involved shooting files.

Re bias:
• The weight of the evidence indicates that African-American drivers were disproportionately stopped compared to their representation in the driving population.
• African-American and Hispanic drivers were disproportionately searched and arrested compared to White drivers.
• Not only are African-American and Hispanic drivers

13

disproportionately searched following traffic stops but they are also less likely to be found with contraband than White drivers.

• The SFPD did not conduct a comprehensive audit of official electronic communications, including department-issued e-mails, communications on mobile data terminals, and text messages on department-issued phones following the texting incidents.

• The SFPD's failure to fully and adequately address incidents of biased misconduct contributed to a perception of institutional bias in the department.

Re accountability:

• The SFPD is not transparent around officer discipline practices.

• Evaluation of employee performance is not an institutionalized practice in the SFPD.

Re race and force:

Community members' race and ethnicity are not "significantly associated with the severity of force" used by officers, although the "majority of deadly use of force incidents by the SFPD involved persons of color."

Re racist texts:

In light of two racist texting scandals, the Police Department should regularly audit officers' electronic communication devices to determine whether they are being used to send biased messages

37. As developed in an evidentiary hearing that took

14

place in this matter in 2015 before an administrative law judge, although the African-American population of San Francisco is only six percent (a figure derived from census data), 42% of people arrested by the SFPD in the relevant time period were  African-Americans, and <u>an astonishing 58% of the people arrested in the Broadway area were African-Americans</u>. These data are published on the SFPD website.

38. Scaring off and intimidating Black people was one reason Captain Lazar directed his officers to park a manned marked police vehicle in front of or directly across the street from the club.

39. The other reason Captain Lazar directed SFPD officers to park a manned and marked SFPD vehicle in front of or directly across the street from the club was and is central to Captain Lazar's strategy. Broadway, with its many clubs, is a very heavily-trafficked street, especially on weekends. Much of that traffic involves people who have been drinking alcohol. As a result, there are significant problems involving rowdy and unlawful behavior. Many of these kinds of events require active involvement by police officers.

40. Under the direction of Captain Lazar, the police officers who were involved in responding to incidents that took place *anywhere* on the 400 block of Broadway indicated in their reports that the incidents involved Atmosphere (now known as Hue) *<u>based solely on the location of the parked SFPD police car at or across the street from the club</u>*. The geographic location of the parked police car was designated in the SFPD reports as the location of the incident no matter where in the 400

block of Broadway the incident had taken place. The reports painted a false and totally misleading picture by their reference to the geographic location of the police vehicle as the locus of the disturbances. The reports supported the false conclusion that plaintiffs' club was at the center of, and the cause of, disturbances that had taken place anywhere in the 400 block of Broadway.

41. As directed by Captain Lazar, SFPD Officer Steve Matthias submitted these reports to the EC and to the ABC that characterized the club as a "disorderly house" and as a law enforcement problem. Based on these reports, the EC amended the club's permit on June 6, 2017, to bar presentation of live entertainment after midnight. (Plaintiffs have been in full compliance with the direction of the EC).

42. Further, the ABC sought to revoke the club's license by filing an Accusation that was intended to shut down the club as a "disorderly house" (those issues are still pending in ABC litigation). This effort by the ABC was based on the distorted and misleading reports filed by SFPD officers, as directed by Captain Lazar.

43. The midnight limitation imposed by the EC was set in motion by actions directed by Captain Lazar. Predictably, it has devastated the club's business. It has facilitated Captain Lazar's plan to eliminate "the wrong crowd, a crowd we do not want" from Broadway and thus drive the club out of business. The midnight limitation has caused multiple negative consequences to plaintiffs:

-Nightly and weekly business of the club has decreased dramatically;

Corporate bookings for parties (one-night rentals) have drastically diminished. This has been particularly devastating in this 2017 season of corporate holiday parties. The income from these one-night rentals typically ranges from $30,000 to $50,000. Nearly all corporations that have rented the club in previous years have chosen not to rent in 2017 because of the midnight limitation;

Plaintiffs have paid, and are paying, substantial fees to attorneys to represent their interests at protracted hearings before the ABC Board and the state Court of Appeals. They are also paying attorney fees to present counsel. Further, as a result of a "raid" on the club by the SFPD that was ordered by Captain Lazar on December 3, 2014, plaintiffs have also had to retain labor lawyers to protect their interests;

The value of the club itself has markedly decreased as a result of the midnight limitation imposed by the EC and the litigation before the ABC Board;

Plaintiff Montoya's personal reputation has been dramatically reduced as a club manager, entrepreneur, and businessman.

Mr. Montoya has lost business opportunities as a result of the racially-motivated actions of the SFPD;

His credit rating has been severely damaged as well, and management of his finances has been a significant problem;

Plaintiffs have seen their assets greatly reduced;

Plaintiffs have been immersed every day in fighting the consequences of the actions of the SFPD. These efforts have caused considerable pain and suffering to them and

have impacted their personal lives, including reduction of time available to spend with their young daughter and otherwise live a peaceful, normal and productive life.

44. From the time Captain Lazar's assault on the club and the plaintiffs began, supervising SFPD authorities, including Commanders and two Chiefs of Police, have acquiesced in, endorsed, enabled, ratified, authorized and effectively approved of the conduct and goals of Captain Lazar.

45. The relevant procedural chronology that has taken place is as follows:

-On February 13, 2015, pursuant to the false and misleading SFPD Reports, the ABC filed an Accusation against the club, citing some 52 alleged "subcounts" (violations). The 52 subcounts were based on false and misleading reports generated by the SFPD. ABC's claim was that the club was a "disorderly house", and that its license should be revoked.

-Evidentiary hearings were conducted before an Administrative Law Judge in 2015.

-On January 19, 2016, the administrative law judge issued an Order in which he dismissed 39.5 of the 52 claims as unsubstantiated, finding that only 11.5 claims were sustained. He rejected plaintiffs' claim of selective enforcement. He determined that the sanction should be a 45-day suspension, 15 days of which would be stayed.

-Plaintiffs appealed to the ABC Appeals Board.

-On October 17, 2016, the ABC Appeals Board decided that:

-Only 4.5 of the original 52 subcounts could be

sustained, and that 47.5 of the claims (*more than 90%*) should be dismissed;

    -The club was NOT a "disorderly house";

    -No penalty of any kind was warranted;

    -The ABC Appeals Board found that the attorneys for the club had made a strong case for selective enforcement, but declined to reach that question because it determined the issues on narrower grounds.

    -The ABC appealed the determination of the ABC Appeals Board to the California Court of Appeals.

    -The Court of Appeals decided on August 28, 2017 that suspension of the license was permissible, but the Court remanded the matter to the ABC Appeals Board with instructions that the Appeals Board determine two issues: (1) Selective enforcement, and (2) whether the discipline was grossly disproportionate to the alleged offenses.

    -Those issues have been briefed and a determination of those issues is pending before the ABC Appeals Board.

    46. In the evidentiary hearings that took place in 2015, the evidence revealed a number of facts, including other actions taken by the SFPD beyond the false and misleading SFPD Reports that were submitted to the EC and the ABC. The testimony and other evidence presented at the hearing (reports, various documents, and videotapes) demonstrated the following:

- The ABC called Benjamin Horne as one of its own witnesses. Mr. Horne was the director of a non-profit organization known as the Top of Broadway Community Benefit District (BCBD). A key function of that organization, whose membership includes the property

owners and nightclub operators in the Broadway corridor, is to maintain order in the often chaotic Broadway nightclub area. Mr. Horne testified that Captain Lazar discussed with him and Mr. Montoya the issue of Atmosphere attracting "the wrong crowd, a crowd we don't want". He testified that, at a meeting in August of 2014 that had been called by Captain Lazar, the issue of hip-hop music and "the wrong crowd, a crowd we don't want", was discussed. Mr. Horne, a witness who was called by the ABC, as noted above, thus confirmed in his testimony that Captain Lazar made clear that his intent was to shut down the club in order to keep "the wrong crowd" off Broadway.

47. Captain Lazar also directed other actions against the club intended to drive the club out of business. For example, Captain Lazar arranged for the SFPD to conduct a "raid" of the club on December 13, 2014. The officers determined that plaintiffs could not satisfactorily demonstrate that all employees of the club were properly covered by Workers Compensation, and they shut down the club. Captain Lazar did not direct any such raid at any other venue. He and his SFPD officers selectively targeted Atmosphere. That raid resulted in allegations of labor law violations, and required plaintiffs to shut down and retain a labor lawyer to protect their interests.

48. Between December 14, 2014 and February 15, 2015, SFPD officers, at the direction of Captain Lazar entered (literally invaded) the club nine times to harass plaintiffs and discourage people from patronizing the club. The police continued their practice of invading the club, which they did at least three times after the club

20

changed its name to Hue.

49. On December 15, 2014, the SFPD invaded the club, disrupting a private party by the Genentech Corporation. The SFPD did so for no reason other than to discourage private corporate rentals of the club.

50. On October 31, 2014, Captain Lazar and other officers were the street and they claim to have heard either one gunshot or a number of gunshots (Captain Lazar testified both ways at the evidentiary hearing). In fact, gunfire had taken place in a parking lot on the block and it was not associated with the club. But the SFPD Report of the event claimed that the gunshot/gunshots were connected to Atmosphere.

51. On January 10, 2015, there was a private birthday party at the club for Mr. Montoya's cousin. Captain Lazar directed that the officers under his command invade that private party. There was no justification for that invasion other than harassment of plaintiffs.

52. On one occasion, an employee of the club, Samantha Bigueur, left the club after work late one night to learn that her car had apparently been hit by a driver who had left the scene. Ms. Bigueur went to the officers who were seated in the patrol car that was parked across the street from the club to ask the officers to file a report about the incident. Instead of doing so, they told her that she would have to go to the police station to file a report. When she protested at having to make her way unescorted to the police station several blocks away at 2 AM, the officers laughed in her face and told her, "We know where you work".

53. Considerable evidence at the evidentiary 2015

21

hearing demonstrated that Captain Lazar and SFPD officers under his command targeted plaintiffs' club in an effort to shut down the club and thus keep African-American people, the crowd that Lazar did not want, off Broadway. His appallingly racist actions have done great damage to plaintiffs.

54. The conduct by Captain Lazar and other SFPD officers set in motion the negative consequences and resultant damages that have befallen plaintiffs. This conduct is the proximate cause of plaintiffs' damages. The SFPD acted under color of state law to deprive plaintiffs of their constitutional rights to equal protection and to property.

55. The rights of plaintiffs that are protected by the United States Constitution have been violated by the SFPD and the City of San Francisco, a great city that suffers from the racism that pervades the SFPD.

**CAUSE OF ACTION**

56. Pursuant to 42 U.S.C 1983 *et seq* and 1988, plaintiffs allege that the defendants jointly and severally have deprived plaintiffs of their constitutional rights.

57. Plaintiffs incorporate by reference all paragraphs herein as if fully set forth herein again.

58. Plaintiffs seek relief and judgment against all defendants herein, all of whom were acting within the course and scope of their duties and who undertook their actions under color of state law.

59. Defendants are jointly and severally liable for the damages. The City of San Francisco acquiesced in and

ratified the conduct of the police officers it employed.

**PRAYER**

60.WHEREFORE, plaintiffs, and each of them, seek and demand:

1)monetary relief and judgment against defendants, jointly and severally, including nominal, presumed, compensatory, and punitive damages, in such amounts as shall be determined by a Jury;

2) Attorneys Fees under 42 U.S.C. § 1988;

3) costs of litigation; and

4) other and further relief as is just and appropriate in the premises of this Civil Rights case.

**JURY DEMAND**

61.Plaintiffs demand that this case be tried by a jury.

November _____, 2017

                  Respectfully submitted,

                  /s/ Robert Bloom

                  Jo Ann Kingston

                  Attorneys for Plaintiffs.